IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. JRR-24-213 |
| | * | |
| BRIAN KEITH ADAMS, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | * | |
| | ****** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Brian Adams made a living out of trafficking firearms into our district. But for the fact that the person he sold to be an undercover agent, he would have been responsible for over a hundred firearms being pushed into the community to be used for who knows what purpose. He did not care. The government respectfully submits that a sentence of 120 months (10 years) is sufficient but not greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553, namely, (1) the nature and circumstances of the offense, (2) the need to avoid unwarranted disparities in sentencing; (3) the need to promote respect for the law and provide just punishment; (4) the need to afford adequate deterrence to criminal conduct; and (5) the need to protect the public from further crimes of the defendant. Adams will appear before the Court for sentencing on August 18, 2025.

### UNITED STATES SENTENCING GUIDELINES CALCULATION

The Presentence Investigation Report indicates that the base offense level for the offenses is 20 pursuant to USSG 2K2.1(a)(4)(B) because the offense involved numerous firearms capable of accepting a large capacity magazine and the defendant was a prohibited person at the time of the offense. An 8-level increase is applied pursuant to USSG 2K2.1(b)(1)(D) because the offense

1

involved between 100 and 199 guns. A 1-level increase is applied because four of the firearms were stolen. USSG 2K2.1(b)(4)(A). A 5-level increase is applied because the firearms were trafficked. USSG 2K2.1(b)(5). A 4-level increase is applied because the firearms were used or possessed in connection with another felony offense. USSG 2K2.1(b)(6)(B).

The adjusted offense level is 38. Adams receives a two-level reduction for his acceptance of responsibility under USSG §3E1.1(a). The government will move for a third level reduction at the time of sentencing which establishes an adjusted offense level of 35. Adams' criminal history category is I. The advisory guidelines range is 168 to 210. The government's recommended sentence is below the advisory guidelines range, but we take into consideration the defendant's early acceptance of responsibility and his lack of significant criminal history in recommending a downward variance in his sentence. We believe that a sentence of 120 months is sufficient but not greater than necessary to achieve the purposes of sentencing.

## FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

### I.    Nature and Circumstances of the Offenses

Since February, Adams has traveled to and from North Carolina, South Carolina and Georgia on multiple occasions illegally purchasing large quantities of firearms, illegally transporting them into the District of Maryland, and illegally selling them for profit to an undercover ATF agent ("UC"). Adams believed that the ATF UC was a felon who could not legally purchase firearms himself. Additionally, Adams believed that all the firearms sold to the UC were being illegally shipped to New Jersey to be sold to various individuals including members of a gang who could not legally purchase firearms themselves. In total, Adams trafficked approximately 103 firearms into Maryland.

Adams was not someone who simply was the transporter in this conspiracy. He ran the business and was motivated by profits he saw for himself. Below are just a sample of concerning

actions and statements by Adams during meetings:

**February 28, 2024** – Adams grabbed a shotgun, loaded it, and raised to his shoulder, telling the UC, "you could go down to the block and blow someone's head off with this."

**March 6, 2024** – Adams advised that he and his co-defendant, Rodney Farrar, had gotten into a shoot-out at a family function and had shot back and forth at each other.

**March 21, 2024** – Adams described himself as a "plug" and advised that he has the connections to procure at least 20 firearms at a time.

**April 5, 2024** – Adams advised he had access to Glock switches or machinegun conversion devices in Atlanta. Adams advised that one of his gun sources is involved in train robberies and that Adams and his cousin (Farrar) went into firearm supplier's house with Micro Draco's (mini AK47) slung around their necks. Adams stated that's "how we move." Adams also advised the UC that he had different "CPN's," which are credit profile numbers, that he had previously been involved in a large money scam and stopped doing it because the Secret Service came after him. Adams further advised that he used CPN's to create different identities for himself. He stated that although the money scam was the only time he was caught, he had traveled all around the country doing "stupid shit."

**April 30, 2014** – During transaction in Charlotte, N.C. with Adams and Farrar, Farrar had a micro draco (AK47) slung around his neck. The UC questioned the firearm being worn outside in public which both Adams and Farrar dismissed.

**June 20, 2024** – Adams told the UC that co-defendant Farrar had been arrested and that Adams facilitated the destructions of Farrar's cellphone SIM card so that police could not recover his cell phone after arrest. On June 18, 2024, P.G. County police arrested Farrar for his involvement in a shooting that occurred at 3200 Glen Avenue in Glen Dale, Maryland. Farrar was subsequently convicted of firearms offenses in state court.

## II.   History and Characteristics of the Defendant

According to the Presentence Report, Adams is in good health, physically and mentally. ECF 55 ¶ ¶ 49, 50. He reports that he has worked various jobs since 2015. Clearly his main source of income has been trafficking firearms on the street with a belief that they would be used for illegal purposes. His mother reported to the probation officer that Adams is a "very intellectual person with a good worth ethic." Id. at ¶ 42. To an extent, the government does not disagree. Adams put thought, planning and strategizing into his firearms trafficking business. He bragged to the UC about how much money he could make from this dangerous trade. All the

recorded transactions with the UC occurred in Maryland except for two that occurred in North Carolina, a suggestion made by Adams to bring down the overall cost for the firearms. Until then, he had been traveling to and from the southern states, carrying firearms in large duffel bags via public transportation. He told the UC that his goal was to make profits from the illegal sale of drugs and guns, so much that he could eventually cut himself out of the transactions but still receive part of the profit. Adams referred to this as "passive income." In other words, he wanted his business to be lucrative and make money, but without having to do any work.

As late as July 9, 2024, Adams was in North Carolina attempting to retrieve additional firearms to sell to the UC the next day, July 10th (the day of his arrest). He told the UC that he attempted to get into his co-conspirator's storage facility (Farrar) for additional firearms but was unsuccessful. As a result, Adams only had seven firearms to sell the morning of his arrest.

On the date of his arrest, Agents executed a search warrant at his residence at 3510 Springdale Avenue in Baltimore. Additional firearms, ammunition, and firearms accessories were recovered.

### III. The Need for the Sentence to Reflect the Seriousness of the Offense, The Need to Protect the Public and the Need for Deterrence

Illegally trafficked firearms often end up in the hands of criminals who use them in the commission of violent crimes. https://www.nbcnews.com/politics/justice-department/federal-report-finds-68000-guns-illegally-trafficked-unlicensed-dealer-rcna146559. Adams had no concern for in whose hands his guns ended up or how they might be used. All he concerned himself with was making money. His crimes were serious and posed a significant danger to the public.

In a study conducted by the United States Sentencing Commission titled Recidivism Among Federal Firearms Offenders, the commission studied the recidivism rate of 25,000 federal offenders. Firearms offenders were most likely to re-offend with a 68% rearrest rate. https://www.ussc.gov/research/research-reports/recidivism-among-federal-firearms-offenders.

Adams is only a criminal history category I, he served a period of incarceration, was placed on supervised probation and subsequently violated that probation. Despite those contacts with the criminal justice system, Adams graduated to more serious offenses showing no regard for the law. There is a great need here to deter Adams from committing future crimes.

### IV.     Downward Variance

The government believes that a downward variance below the advisory sentencing guidelines range is appropriate in Adams' case, balancing the seriousness of his crimes with his criminal history and his early acceptance of responsibility. The fraud conviction that he received in 2012 (and subsequent supervision violations in 2013 and 2015) resulted in minimal periods of incarceration and Adams has no history of violence.

### Conclusion

For the reasons set forth above, the government believes that a sentence of 120 months of imprisonment is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

/s/
Kim Y. Hagan
Assistant United States Attorney